IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| ERIC HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:12cv591-MHT |
| | ) | (WO) |
| M.D. BYNER, | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION AND ORDER

Plaintiff Eric Harris brings this action against defendant M.D. Byner, an officer with the Montgomery, Alabama Police Department.  Harris sues Officer Byner in his individual capacity and claims that he violated Harris's rights under the Fourth Amendment as enforced through 42 U.S.C. § 1983 and that he committed the state-law tort of false imprisonment.  Jurisdiction is proper under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction).  This cause is now before the court on the parties' cross-motions for summary judgment.  Both motions will be denied.

## I. SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).


## II. BACKGROUND

The facts, as can be discerned from the somewhat sparsely developed evidentiary record in this case, are largely undisputed.  Late one night, Montgomery Police Officer R.F. Hubbard observed a car driving erratically.  The car nearly hit a pole and sign and then veered into an

oncoming lane.  By the time Hubbard and another officer
located the car, the driver had abandoned it and fled on
foot.  Hubbard learned that the car was registered to
Harris and had not been reported stolen.  Hubbard impounded
the car and authorized the tow company to release the car
to Harris.

Some six hours later, before anyone contacted him to
pick up his car, Harris called the police to report that
his car had been stolen.  Officer Byner, who was neither
present during the chase or investigation the night before,
nor aware of those events at this point, responded to
Harris's home.

Upon arriving at Harris's house, Officer Byner
obtained the car's license plate number and
vehicle-identification number.  He ran a computer check on
the car to determine if it had already been located.  After
running that search, Byner received a message to call
Montgomery's Department of Communications.  He did so, and
was told that hours earlier an unknown individual had used

3

a car with that license plate and vehicle-identification number to elude officers and then left the car on the side of the road to flee on foot. Byner states that, from his experience as a law-enforcement officer, he knows that it is common for an individual fleeing from the police in his own car to leave the car, flee on foot, and report the car stolen a short time later. The situation before Byner appeared to fit this pattern.

According to Harris, Officer Byner handcuffed him, said something like "YOU know what happened to your car, don't you," and told Harris to stand by his car while Byner "checked on things." Affidavit of Eric L. Harris (Doc. No. 40-1) at 1 (emphasis in original, internal quotation marks omitted). Harris felt insulted and that he had been treated as a criminal for no reason. Harris believes Byner racially profiled him by assuming that because Harris is black he was likely the perpetrator. Byner points out that he is also black.

Officer Byner does not dispute that he handcuffed Harris nor that he suspected Harris of being the driver that Hubbard observed the night before.  He states that he told Harris that he was not under arrest, but that he was being detained for investigative purposes.  Byner offers no additional justification for the decision to handcuff Harris.

After handcuffing Harris, Byner again contacted the Department of Communications, this time seeking to obtain a description of the individual who fled from the car during the night.  After a couple of minutes, he was told that officers involved in the incident were not able to provide a description.  He released Harris from the handcuffs and told him how to retrieve his car.  The entire encounter between Harris and Byner lasted approximately eight minutes.

Harris filed suit asserting a violation of his rights under the Fourth Amendment and a claim of state-law false imprisonment.  Officer Byner moved for summary judgment,

claiming qualified immunity as to Harris's constitutional claim, and Alabama state-agent immunity as to his state-law claim.  Harris also moved for summary judgment.

### III. DISCUSSION

#### A.

Officer Byner argues that, based on qualified immunity, he is entitled to summary judgment with regard to the § 1983 claim.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In deciding whether an official is entitled to this immunity, courts analyze (1) whether the plaintiff has shown an actual violation of his right and (2), if so, whether the right at issue was clearly established at the time it was violated.  Id. at 232. The

6

sequence in which these questions are analyzed is left to the court's discretion. <u>Id</u>. at 236. The court will first determine whether Byner in fact violated Harris's constitutional rights.

i.

The Fourth Amendment protects the people from "unreasonable searches and seizures." U.S. Const. amendment IV. It generally prohibits state actors from seizing an individual absent sufficient justification. <u>United States v. Dunn</u>, 345 F.3d 1285, 1288 (11th Cir. 2003). The Eleventh Circuit Court of Appeals has noted three categories of police-citizen interactions. <u>United States v. Hastamorir</u>, 881 F.2d 1551, 1556 (11th Cir. 1989). Non-coercive interactions with police do not implicate the Fourth Amendment. <u>Id</u>. Brief detentions for further investigation, known as "<u>Terry</u> stops," must be justified by reasonable and articulable suspicion. <u>Id</u>.; <u>see also</u> <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). Finally, full arrests

7

trigger the ordinary requirement of probable cause. Hastamorir, 881 F.2d at 1556.

The parties frame this case as a dispute over how to categorize the interaction: was it a Terry stop or an arrest?   But this disagreement obscures what the court believes is the more critical issue in this case: Officer Byner has pointed to no circumstance that might justify his decision to handcuff Harris.

"It is well settled that, under the Fourth Amendment, '[t]he scope of a detention must be carefully tailored to its underlying justification' and that the 'investigatory methods employed [during a detention] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'" Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1306 (11th Cir. 2006) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). That is, as the Supreme Court explained in Terry itself, even where sufficient initial justification exists, a seizure may still be found to be unreasonably intrusive.

"[O]ur inquiry is a dual one--whether the officer's action
was justified at its inception, and whether it was
reasonably related in scope to the circumstances which
justified the interference in the first place." Terry, 392
U.S. at 19-20; see also Croom v. Balkwill, 645 F.3d 1240,
1248 (11th Cir. 2011) (considering separately whether
seizure was "lawful at its inception" and whether it was
"lawful in its scope and duration").

In this case, Officer Byner argues that his seizure of
Harris was a Terry stop.  The court agrees that this
interaction was a Terry stop and that the seizure was
justified at its inception by reasonable suspicion.[1]

---

1. The Eleventh Circuit has articulated four non-
exclusive factors to consider determining whether a
seizure was a de facto arrest or a Terry stop: (1) the
law enforcement purposes of the detention; (2) the
diligence with which the police pursue the investigation;
(3) the scope and intrusiveness of the detention; and (4)
the duration of the detention. United States v. Acosta,
363 F.3d 1141, 1146 (11th Cir. 2004).  Weighing all these
factors, and particularly considering that the entire
interaction took only eight minutes, the court agrees
with Byner that this interaction is more in the nature of
a Terry stop than an arrest.

(continued...)

However, the court cannot find on this slim record that
Byner's decision to handcuff Harris was reasonably related
in scope to the circumstances which justified the seizure
in the first place.

Officer Byner has offered no explanation for the
handcuffing whatsoever. He has not contended, for example,
that Byner or anyone else was in danger; he has not
contended that Harris constituted a flight risk; and he has
not contended that the handcuffs were required to maintain
the status quo.   Indeed, he has not articulated any
justification for the use of handcuffs at all.

The use of handcuffs in a <u>Terry</u> stop without any
justification is a Fourth Amendment violation.   In <u>Gray</u>,

---

1.(...continued)
    Further, the court concludes that Byner did have
reasonable suspicion.   Byner states that in his
experience it is common for an individual who has eluded
police to abandon his car and later report it stolen;
Harris has not offered any evidence to rebut this
contention.   Given that Harris's apparently innocuous
conduct of calling the police to report the car stolen
fit with Byner's experience of this pattern, the court
concludes on this record that Byner's suspicion was
reasonable.   Harris does not argue that Byner lacked
reasonable suspicion, only that he lacked probable cause.

10

a Sheriff's Deputy, working as a school-resource officer,
detained and handcuffed a student.  458 F.3d at 1301.  The
court determined that the deputy had reasonable suspicion
to detain the student, having witnessed her threaten a
coach.  <u>Id</u>. at 1305.  However, the court found that the
additional step of handcuffing the student was
unreasonable:

> "By his own admission, Deputy Bostic did
> not handcuff Gray to effect an arrest of
> Gray.  Rather, his handcuffing of Gray
> was during an investigatory stop.
> Nonetheless, during an investigatory
> stop, an officer can still handcuff a
> detainee when the officer reasonably
> believes that the detainee presents a
> potential threat to safety. <u>See</u> <u>United</u>
> <u>States v. Hastamorir</u>, 881 F.2d 1551, 1557
> (11th Cir. 1989); <u>United States v.</u>
> <u>Blackman</u>, 66 F.3d 1572, 1576–77 (11th
> Cir. 1995); <u>United States v. Kapperman</u>,
> 764 F.2d 786, 790–91 & n. 4 (11th Cir.
> 1985).  The problem in this case for
> Deputy Bostic is that, at the time Deputy
> Bostic handcuffed Gray, there was no
> indication of a potential threat to
> anyone's safety. ... Deputy Bostic does
> not even claim that he handcuffed Gray to
> protect his or anyone's safety. Rather,
> Deputy Bostic candidly admitted that he
> handcuffed Gray to persuade her to get
> rid of her disrespectful attitude and to

> impress upon her the serious nature of
> committing crimes. In effect, Deputy
> Bostic's handcuffing of Gray was his
> attempt to punish Gray in order to change
> her behavior in the future. Thus, Deputy
> Bostic's handcuffing Gray was not
> reasonably related to the scope of the
> circumstances that justified the initial
> investigatory stop."

Id. at 1305-6. In other words, the court found that Bostic

had used handcuffs without any safety rationale, and with

only the illegitimate justification of punishing Gray.

That use of handcuffs without any legitimate justification

in a Terry stop, even one supported by reasonable

suspicion, was unreasonable and unconstitutional.

While the Gray court applied the standard articulated

in New Jersey v. T.L.O., 469 U.S. 325, 341-2, to assess the

reasonableness of school seizures by police officers, Gray,

458 F.3d at 1304, the Gray court relied on Terry and its

progeny because the T.L.O. standard "mirrors the standard

announced in Terry v. Ohio governing the reasonableness of

investigatory stops." Id. at 1305. Gray was therefore

decided under the same standard applicable in this case.

Indeed, the Eleventh Circuit has repeatedly made it clear that officers must justify the use of handcuffs with some legitimate rationale above and beyond the existence of mere reasonable suspicion.  See United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000) (concluding that "to maintain the safety of the officers and the ongoing investigation of the residence, handcuffing Ms. Gil and detaining her in the back of the police car was reasonable"); United States v. Fields, 178 F. App'x 890, 893 (11th Cir. 2006) ("Police are permitted to take reasonable action to protect themselves or to maintain the status quo," including the use of handcuffs for those purposes); United States v. Lester, 477 F. App'x 697, 700 (11th Cir. 2012) ("officers may take reasonable steps [including the use of handcuffs] to ensure their safety so long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous"); United States v. Williams, 185 F. App'x 866, 870 (11th Cir. 2006) (acknowledging that "handcuffing and

placement in a patrol car is a severe form of intrusion"
but concluding that "in this unusual case" the detention
was reasonable in light of reports that the defendant fired
a shotgun multiple times).[2]

The Eleventh's approach to handcuffing during <u>Terry</u>
stops has also been echoed in other circuits.  For example,
in <u>United States v. Acosta-Colon</u>, 157 F.3d 9 (1st Cir.
1998), the First Circuit Court of Appeals noted that "the
use of handcuffs, being one of the most recognizable
indicia of a traditional arrest, substantially aggravates
the intrusiveness of a putative <u>Terry</u> stop."   <u>Id</u>. at 18
(internal quotation marks omitted).   The court therefore
required that, "when the government seeks to prove that an
investigatory detention involving the use of handcuffs did
not exceed the limits of a <u>Terry</u> stop, it must be able to

_____

2. As Byner points out, the Eleventh Circuit has held
that handcuffing an individual does not necessarily
transform a <u>Terry</u> stop into a full arrest.   <u>See</u>
<u>Hastamorir</u>, 881 F.2d at 1556; <u>United States v. Kapperman</u>,
764 F.2d 786, 790 n.4 (11th Cir. 1985); <u>United States v.</u>
<u>Blackman</u>, 66 F.3d 1572, 1576 (11th Cir. 1995).  But those
cases do not establish the proposition that handcuffing
cannot render a <u>Terry</u> stop unreasonably intrusive.

<u>point to some specific fact or circumstance</u> that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm." <u>Id</u>. at 18-19 (emphasis added). Similarly, in <u>Morris v. Noe</u>, 672 F.3d 1185 (10th Cir. 2012), the Tenth Circuit Court of Appeals noted that, while handcuffs do not necessarily transform a <u>Terry</u> stop into an arrest, their use will "generally exceed the scope of an investigative detention" and must be independently justified. <u>Id</u>. at 1192 (emphasis and internal quotation marks omitted). And the Eighth Circuit Court of Appeals, in <u>El-Ghazzawy v. Berthiaume</u>, 636 F.3d 452 (8th Cir. 2011), noted that failure to require evidence of such a justification would mean that "officers would be allowed to handcuff ... virtually every suspect they encounter, without regard to the nature of the crime, the behavior exhibited by the

suspect, or the circumstances surrounding the alleged crime." Id. at 458-9.

   In this case, Byner has pointed to no "specific fact or circumstance that could have supported a reasonable belief" that handcuffs were required. Acosta-Colon, 157 F.3d at 18. Indeed, in Gray the officer had offered at least some justification for the decision to use handcuffs, albeit an illegitimate one. Byner has not put forward any justification for handcuffs at all. There is no fact or circumstance in this case to indicate any "potential threat to anyone's safety," the only justification for the use of handcuffs in a Terry stop recognized in Gray. 458 F.3d at 1306. Nor are there facts to support other justifications Byner might have argued for, such as maintaining the status quo. Indeed, even the notion that Harris could have been a flight risk is utterly incredible on this record: After all, it was Harris who called the police, and it was Harris who then waited for the officer at his home.

In short, Byner applied handcuffs to Harris without any justification at all. <u>Gray</u> and other Eleventh Circuit cases establish that handcuffing during a <u>Terry</u> stop without any legitimate justification is unreasonable. Therefore, Byner violated Harris's Fourth Amendment right.

## ii.

Harris must still show that the violation was clearly established. "Qualified immunity protects government officials, in their individual capacities, from suit unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." <u>Pace v. Capobianco</u>, 283 F.3d 1275, 1282 (11th Cir. 2002). As this court has explained:

> "[The requirement that a right be clearly established] is fundamentally a question of fair notice: If the law does not make the officer aware that his 'conduct would

17

> be clearly unlawful,' then he is
> protected by qualified immunity, <u>Saucier
> v. Katz</u>, 533 U.S. 194, 202 (2001);
> however, if the plaintiff can show that
> 'a materially similar case has already
> been decided' in his favor, then fair
> notice exists and qualified immunity does
> not attach. <u>Mercado v. City of Orlando</u>,
> 407 F.3d 1152. 1159 (11th Cir. 2005)."

<u>Schultz v. City of Brundidge</u>, 2012 WL 705358 at *5 (M.D.
Ala. 2012) (Thompson, J.).

As discussed above, <u>Gray</u> is materially similar to the
instant case.  There, as here, the officer handcuffed an
individual during a <u>Terry</u> stop that had been justified at
its inception.  And there, as here, the circumstances did
not support any legitimate justification for the
handcuffing.

The court acknowledges that the age of the plaintiff,
who was nine years old, played a role in <u>Gray</u>.  But the
court is satisfied that <u>Gray</u> constitutes clearly
established law despite the factual difference. First, the
portion of <u>Gray</u> finding that the officer committed a
constitutional violation turns not on Gray's age but on the

lack of any safety rationale for handcuffing her.  Second, the Gray court relied on cases decided in the context of Terry stops in general rather than only school- and minor-specific cases.  And, third, the Gray court noted that there had been no cases "addressing before today when it may be reasonable to use handcuffs in an investigatory stop absent a safety rationale." 458 F.3d at 1306 (emphasis added).  In other words, the Gray court viewed itself as addressing the use of handcuffs in Terry stops generally, not the use of handcuffs only on children.  All these considerations leave the court firmly convinced that Gray, decided in 2006, gave Byner ample notice that unjustified handcuffing during a Terry stop violates the Fourth Amendment.  As such, he is not entitled to qualified immunity, or to summary judgment, on the § 1983 claim.

Furthermore, even if the holding of Gray were not sufficient standing alone to give Byner fair notice that his conduct was unconstitutional, there is another aspect of Gray that supports the court's conclusion that Byner was

on notice. The <u>Gray</u> court concluded that, despite the absence of any factually similar case-law, the officer was not entitled to qualified immunity because his action was an "obvious violation" of the Fourth Amendment. <u>Gray</u>, 458 F.3d at 1307. The court recognized that, in so-called "obvious clarity cases," an officer's conduct may be "well beyond the hazy border that sometimes separates lawful conduct from unlawful conduct, such that every objectively reasonable officer would have known that the conduct was unlawful." <u>Id</u>. at 1306-7 (internal quotation marks and citation omitted). In such a case, officers are on notice despite the lack of factually similar case-law precedent. <u>See</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (suggesting that a violation may be "so obvious" that general constitutional principles may give fair warning); <u>id</u>. ("'general statements of the law are not inherently incapable of giving fair and clear warning'" and in some instances "'a general constitutional rule already identified in the decisional law may apply with obvious

clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful'") (quoting United States v. Lanier, 520 U.S. 259, 271 (1997)) (internal quotation marks omitted).

The Gray court found that handcuffing a nine-year-old during a Terry stop without a safety rationale in order to punish her was an obvious violation of her Fourth Amendment right.   But, again, at least in Gray there was some justification offered for the handcuffs, albeit an illegitimate one.   In this case, there is simply no justification at all.   The court finds that the use of handcuffing during a Terry stop with no justification is "well beyond the hazy border that sometimes separates lawful conduct from unlawful conduct, such that every objectively reasonable officer would have known that the conduct was unlawful," Gray, 458 F.3d at 1306-7 (internal quotation marks omitted); it is therefore obvious that such use is unconstitutional.   Byner was on notice and is therefore not entitled to qualified immunity.

B.

Officer Byner also seeks summary judgment as to Harris's state-law claim of false imprisonment on the basis of Alabama's state-agent immunity doctrine as restated in Ex parte Cranman, 792 So.2d 392 (Ala. 2000), and under 1975 Ala. Code § 6-5-338.

False imprisonment is defined by statute as "the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." 1975 Ala. Code § 6-5-170.  Alabama law also specifically authorizes officers to conduct Terry-type stops, 1975 Ala. Code § 15-5-30, and to search for weapons on reasonable suspicion of danger to the officer, 1975 Ala. Code § 15-5-31.  In this case, the court has already determined that Officer Byner's initial seizure of Harris was a Terry stop supported by reasonable suspicion; therefore, to that point, there was no unlawful detention.  Cf. Upshaw v. McArdle, 650 So. 2d 875, 878 (Ala. 1994) (existence of

22

probable cause warranted judgment for officer on false-imprisonment claim).

The court has also determined that, for Fourth Amendment purposes, Byner's use of handcuffs was unreasonable. Alabama law does not appear to have addressed the question of whether a seizure that is justified at its inception, but unreasonably intrusive in its scope, can constitute "unlawful detention" for the purposes of the tort of false imprisonment. Other authorities indicate that a false-imprisonment claim is viable under these circumstances. See 35 C.J.S. False Imprisonment § 35 (2013) ("Circumstances attending or following a detention lawful in its inception may render it unlawful so as to impose liability for false imprisonment."); id. at § 38 ("A person who in arresting or detaining a person imposes unnecessary force, hardship, cruelty, or indignity may be guilty of false imprisonment."); see also Landry v. A-Able Bonding, Inc., 75 F.3d 200, 206 (5th Cir. 1996) (Under Texas law,

23

"[l]iability for false imprisonment is not foreclosed by a lawfully executed initial arrest, for false imprisonment may result from an unlawful detention following a lawful arrest").

For the same reasons that handcuffing without justification during a <u>Terry</u> stop is obviously unreasonable and violates federal law, this court believes that handcuffing without justification during a state-authorized <u>Terry</u>-type stop is obviously unreasonable and thus violates state law. This court therefore holds that Harris's evidence establishing that Officer Byner handcuffed him with no justification whatsoever establishes a viable false-imprisonment claim.

Officer Byner claims that he is nevertheless immune. Under Alabama law,

> "Every peace officer ... whether appointed or employed as such peace officer by the state or a county or municipality thereof ... shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any

> discretionary function within the line
> and scope of his or her law enforcement
> duties."

1975 Ala. Code § 6-5-338. Section 6-5-338, therefore,
overlaps with Alabama's common-law doctrine of state-agent
immunity.  In <u>Ex parte Butts</u>, 775 So. 2d 173, 177-78 (Ala.
2000), the Alabama Supreme Court adopted a restatement of
common-law state-agent immunity, first articulated by the
plurality in <u>Cranman</u>, as follows, in part:

> "A State agent shall be immune from civil
> liability in his or her personal capacity
> when the conduct made the basis of the
> claim against the agent is based upon the
> agent's ... .
>
> (4)  exercising  judgment  in  the
> enforcement of the criminal laws of the
> State,  including,  but  not  limited  to,
> law-enforcement  officers'  arresting  or
> attempting to arrest persons; ...."

<u>Id</u>. at 177-78 (quoting <u>Cranman</u>, 792 So.2d at 405
(plurality opinion)).  The court also recognized certain
exceptions to, or limitations on, this immunity as follows,
in part:

> "[However,] a State agent shall not be
> immune from civil liability in his or her
> personal capacity
>
> (1) when the Constitution or laws of the
> United States, or the Constitution of
> this State, or laws, rules, or
> regulations of this State enacted or
> promulgated for the purpose of regulating
> the activities of a governmental agency
> require otherwise; or
>
> (2) when the State agent acts willfully,
> maliciously, fraudulently, in bad faith,
> beyond his or her authority, or under a
> mistaken interpretation of the law."

Id. Although this common-law doctrine speaks to "State

agents," it has since been modified to be coextensive with

the § 6-5-338 statutory immunity offered peace officers for

"a county or municipality," with the result that the

immunity in ¶ (4) above is no longer limited to state

employees but now extends to county and municipal police

officers.   Paragraph 4, along with the opening paragraph,

now reads, in part, as follows:

> "A State agent shall be immune from civil
> liability in his or her personal capacity
> when the conduct made the basis of the
> claim against the agent is based upon the
> agent's ...

> (4) exercising judgment in the
> enforcement of the criminal laws of the
> State, including, but not limited to,
> law-enforcement officers' arresting or
> attempting to arrest persons, or serving
> as peace officers under circumstances
> entitling such officers to immunity
> pursuant to § 6-5-338(a), Ala. Code
> 1975."

Hollis v. City of Brighton, 950 So.2d 300, 309 (Ala.2006).

Thus, even the exceptions to, or limitations on, state-agent immunity apply to § 6-5-338 as well. Downing v. City of Dothan, 59 So. 3d 16, 19-20 (Ala. 2010).

Under the burden-shifting framework established by the Alabama Supreme Court, the defendant bears the initial burden of establishing that he was acting in a function of the type that would entitle him to state-action immunity. Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala. 2006); see also Grider v. City of Auburn, 618 F.3d 1240, 1255 (11th Cir. 2010). "If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously,

fraudulently, in bad faith, or beyond his or her authority." <u>Reynolds</u>, 946 So.2d at 452.

In this case, there is no dispute that Byner was a peace officer as defined in § 6-5-338(a). The question is whether, in deciding to handcuff Harris, Byner was performing a discretionary function for the purposes of § 6-5-338, and exercising judgment in the enforcement of the criminal laws, for the purposes of <u>Cranman</u>.[3]

"Discretionary functions" are broadly defined as "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." <u>Borders v. City of Huntsville</u>, 875 So. 2d 1168, 1178 (Ala. 2003) (internal quotation marks omitted). "Generally,"

---

3. It appears these two formulations are essentially equivalent, except that latter applies only to the enforcement of the criminal laws, while the former applies generally to discretionary functions. <u>See</u> <u>Hollis</u>, 950 So.2d at 309. That difference does not matter in this case, which relates to the enforcement of the criminal laws.

28

therefore, "arrests and attempted arrests are classified as discretionary functions."  Id.

However, while police officers have discretion to arrest or to attempt to arrest, that discretion is not unbridled, and when an officer exceeds the legal bounds for the exercise of that discretion, the discretionary-function exception does not shield the officer.  For example, in Telfare v. City of Huntsville, 841 So. 2d 1222, 1228 (Ala. 2002), the Alabama Supreme Court found an arrest to fall outside the bounds of discretionary functions and the exercise of judgment.  In that case, the court determined that, under state law, an officer has no authority to arrest for a misdemeanor not committed in his presence; therefore, the officer had no discretion to do so, and the arrest was not a discretionary function.  841 So.2d at 1229.  The court rejected immunity under both § 6-5-338(a) and Cranman.  Id.

In Borders, the court extended the reasoning of Telfare.  After finding that the only issue to be resolved

was whether the officer in question had been performing a
discretionary function, the court adopted the federal
"arguable probable cause" standard to determine whether an
arrest without probable cause was within the officer's
discretion.   875 So. 2d at 1180.   Because the facts
surrounding the officer's arrest of the plaintiff were
disputed, the appellate court was unable to determine
whether the officer had arguable probable cause and thus
was entitled to discretionary-function as a matter law.
The court reversed the trial court's grant of summary
judgment against the plaintiff and remanded the case for
resolution of those underlying disputed factual issues.

Here, while Officer Byner clearly has discretion under
state law to handcuff a person while conducting a Terry-
type stop, that discretion, like all police discretion, is
not unbridled, and, when an officer exceeds the legal
bounds for the exercise of that discretion, the
discretionary-function exception does not shield the
officer.   This court has already found that Officer Byner

30

exceeded his authority when he handcuffed Harris with no justification.   Byner is therefore not entitled to discretion-function immunity.

Alternatively, even if Officer Byner's conduct in this case could be viewed as a discretionary function under Alabama law, he is still not entitled to immunity.   As stated, <u>Cranman</u>, as modified, recognizes certain exceptions to, or limitations on, immunity: if the police officer "acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority."   <u>Reynolds</u>, 946 So.2d at 452.   Because Byner handcuffed Harris for no reason connected to the <u>Terry</u> stop, his conduct could be viewed as nothing less than willful or in bad faith and simply to hurt or embarrass Harris.[4]   Therefore, Byner's motion is denied as to the state-law claim as well.

---

4.   It could be argued that Officer Byner's conduct also falls within another exception to immunity, as beyond his authority. The court does not reach that issue.

C.

Harris also seeks summary judgment; as best as the court can discern from his unclear briefing, his motion relates only to his § 1983 claim.  Although the court has concluded on this thin record that Byner violated Harris's Fourth Amendment rights, in the court's view the prudent course is to proceed to trial on both claims in order to assure that the facts are fully aired.  The court therefore denies summary judgment to Harris on the § 1983 claim in the exercise of discretion.

"[E]ven in the absence of a factual dispute, a district court has the power to deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial."  Lind v. United Parcel Serv., Inc., 254 F.3d 1281, 1285 (11th Cir. 2001) (internal quotation marks omitted); see also United States v. Certain Real and Personal Prop. Belonging to Hayes, 943 F.2d 1292, 1297 (11th Cir. 1991) ("A trial court is permitted, in its discretion, to deny even a

32

well-supported motion for summary judgment, if it believes

the case would benefit from a full hearing"); 10A Wright,

Miller & Kane, Fed. Prac. & Proc. Civ. § 2728 (3d ed.).[5]

---

5. The 2010 amendments to Rule 56 modified the language of current subsection (a). From 2007 to 2010, the word "shall," in the phrase "The court shall grant summary judgment," was briefly changed to "should." The 2007 amendments had used the term "should" to reflect that cases interpreting the rule had recognized that courts have some discretion to deny even a well-supported summary-judgment motion. See Fed.R.Civ.P. 56(a) advisory committee's note to 2007 amendments. This change was reversed in 2010; the committee expressed concern that the term "should" did not reflect the caselaw interpreting the rule and concluded that, "Eliminating 'shall' created an unacceptable risk of changing the summary-judgment standard." Fed.R.Civ.P. 56(a) advisory committee's note to 2010 amendments. Despite the changes in language, and in light of the committee's concerns about altering the established summary-judgment standard, it is clear that precedential interpretations of the rule preceding both the 2007 and 2010 changes remain good law. See Farmers Ins. Exchange v. RNK, Inc., 632 F.3d 777, 782 n. 4 (1st Cir. 2011) (the 2010 amendments were "'intended to improve the procedures for presenting and deciding summary-judgment motions'" but not "'to change the summary-judgment standard or burdens'") (quoting Committee on Rules of Practice and Procedure, Report of the Judicial Conference, page 14 (Sept. 2009)) (emphasis removed); Wells Fargo Bank, N.A. v. Trotman, 2013 WL 1613243 at *1 n.1 (M.D. Ala. 2013) (Capel, M.J.) (concluding that prior Rule 56 decisions continue to bind the court). Under the pre-2007 rule, which used the same "shall" terminology that is again in effect, the court
(continued...)

In this case, the court is of the opinion that the better course is to proceed to trial. The parties have focused entirely on whether this interaction between Officer Byner and Harris was an arrest or a <u>Terry</u> stop. But the court has determined that the true issue here is whether Officer Byner's use of handcuffs was reasonably related in scope to the circumstances which justified the seizure in the first place. As no depositions were taken in this matter, and most of the evidence submitted at summary judgment came in the form of very limited affidavits, the court believes that the interests of justice will be better served by fully airing the events of the day in question, particularly with regard to any possible justification for the use of handcuffs.

The court therefore exercises its discretion to deny Harris's summary-judgment motion.

---

5.(...continued)
had discretion to deny a wells-supported summary judgment
motion.  The court concludes it still does.

\*\*\*

Accordingly, it is ORDERED that the motion for summary judgment (Doc. No. 37) filed by defendant M.D. Byner and the motion for summary judgment (Doc. No. 39) filed by plaintiff Eric Harris are denied.

DONE, this the 14th day of January, 2014.


    /s/ Myron H. Thompson    
UNITED STATES DISTRICT JUDGE